SanMiguel v Grimaldi (2025 NY Slip Op 05780)

SanMiguel v Grimaldi

2025 NY Slip Op 05780

Decided on October 21, 2025

Court of Appeals

Singas

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on October 21, 2025

No. 67 

[*1]Veronica SanMiguel, & c. et al., Respondents,
v
Meryl Y. Grimaldi, & c. et al., Appellants, et al., Defendant.

Charles L. Bach, Jr., for appellant Meryl Y. Grimaldi.
James M. Catterson, for appellant St. Barnabas Hospital.
Annette G. Hasapidis, for respondents.
New York Trial Lawyers' Association, Defense Association of New York, Inc., Greater New York Hospital Association, et al., New York State Academy of Trial Lawyers, Medical Society of the State of New York, et al., amici curiae.

SINGAS, J.

In this appeal, we must determine whether this Court's precedent limiting recovery of purely emotional damages for prenatal torts, as reaffirmed in Sheppard-Mobley v King (4 NY3d 627 [2005]), applies to medical malpractice claims premised on lack of informed consent. We hold that it does. We are further asked, by plaintiff and the Appellate Division, to overrule our unanimous holding in Sheppard-Mobley and prior cases dictating that result. Adherence to stare decisis principles leads us to decline that invitation.
I.
Plaintiff Veronica SanMiguel was admitted to defendant St. Barnabas Hospital (St. Barnabas) on July 1, 2012, after she did not go into labor by her due date. She came under the care of defendant Dr. Meryl Y. [*2]Grimaldi who, along with St. Barnabas's nursing staff, induced labor. On the morning of July 3, Dr. Grimaldi attempted to deliver the baby via vacuum extraction but was unsuccessful. Dr. Grimaldi subsequently performed an emergency C-section and delivered plaintiff's son alive but in serious condition. He died eight days later, after being transported to the hospital's neonatal intensive care unit and eventually to Montefiore Medical Center, where he was taken off life support.
Plaintiff filed the instant action against Dr. Grimaldi, St. Barnabas, and defendant Julie Crocco, a certified nurse-midwife at St. Barnabas. Plaintiff asserted five causes of action in the operative complaint: (1) medical malpractice on behalf of her son's estate, (2) medical malpractice on her own behalf, (3) lack of informed consent on behalf of her son's estate, (4) lack of informed consent on her own behalf, and (5) loss of her son's services. As to count four, plaintiff sought only emotional damages. As relevant here, Dr. Grimaldi moved for summary judgment dismissing the second and fourth causes of action, relying on Sheppard-Mobley. In response, plaintiff conceded that count two should be dismissed.
Supreme Court granted Dr. Grimaldi's motion as to the second cause of action but denied her motion as to the fourth (see 2020 NY Slip Op 35651[U] [Sup Ct, Bronx County 2020]). The court concluded that summary judgment on the fourth count was inappropriate because "there is a triable issue of fact as to whether plaintiff consented to Dr. Grimaldi's use of a vacuum extractor to attempt to deliver the infant," and "the parties dispute whether the use of the vacuum extractor proximately caused plaintiff's alleged injuries" (id. at *18).
The Appellate Division affirmed the denial of summary judgment dismissing the fourth cause of action (see 229 AD3d 152 [1st Dept 2024]).[FN1] The Court first held that Sheppard-Mobley did not bar plaintiff's claim for emotional harm arising from the alleged lack of informed consent for the vacuum extraction procedure (see id. at 157-160). The Court posited that a claim for lack of informed consent "is separate and distinct from general allegations of medical negligence" like those at issue in Sheppard-Mobley (id. at 158). Specifically, the Court stated that lack of informed consent "comprises different elements" and "implicates the prospective mother's active role as decision-maker for herself and on behalf of her fetus, with both capacities concerning the mother's right to the integrity of her body" (id. at 159). Based on this novel premise, the Court held that the claim was "not subject to the bar set forth" in Sheppard-Mobley (id. at 160). Alternatively, "assuming for the sake of argument that Sheppard-Mobley applie[d] similarly to claims for ordinary medical malpractice and lack of informed consent," the Court "respectfully invite[d] the Court of Appeals to revisit the issue" (id.). The Appellate Division expressed its view that our precedent "is . . . unjust, as well as opposed to experience and logic" (id.), and that its "continued application . . . to claims like the present" would "be repugnant to common-sense justice" and to what the Appellate Division described as "the fundamental principle that one may seek redress for every substantial wrong" (id. at 163-164 [internal quotation marks and citation omitted]).
One Justice dissented in part (see id. at 167 [Renwick, P.J., dissenting in part]). In the dissenting Justice's view, Sheppard-Mobley "mandate[d] dismissal of this claim because [plaintiff] did not suffer an independent physical injury stemming from the lack of informed consent, and her emotional damages ar[o]se solely from the physical injuries sustained by the infant who was born alive" (id. at 168). Thus, "to the extent Sheppard-Mobley implicates the Court of Appeals' reluctance to expand emotional damages in cases involving prenatal torts," the dissenting Justice concluded that "it should apply with equal force to claims of lack of informed consent" (id. at 171).
The Appellate Division subsequently granted Dr. Grimaldi and St. Barnabas leave to appeal and certified the question of whether its order was properly made (see 2024 NY Slip Op 71936[U] [1st Dept 2024]).[FN2]
II.
New York common law has long viewed with suspicion tort claims seeking the recovery of purely emotional damages. We have decided that "for practical reasons, there is ordinarily no duty to exercise care to avoid causing mental disturbance" (Comstock v Wilson, 257 NY 231, 238 [1931]). In other words, a plaintiff generally may not recover purely emotional damages resulting from a defendant's breach of a duty of care (see Johnson v Jamaica Hosp., 62 NY2d 523, 526 [1984]; Howard v Lecher, 42 NY2d 109, 112 [1977]; see also Comstock, 257 NY at 239; Mitchell v Rochester Ry. Co., 151 NY 107, 110 [1896], overruled by Battalla v State of New York, 10 NY2d 237 [1961]). By contrast, "[w]here a party's negligence is directly responsible for physical injury," "there is no question but that the injured party may recover both for the actual physical injury sustained and for the concomitant mental and emotional suffering which flow as a natural consequence of the wrongful act" (Howard, 42 NY2d at 111).
Over the twentieth century, we identified three narrow instances where a plaintiff may recover for emotional suffering absent physical injury (see generally Greene v Esplanade Venture Partnership, 36 NY3d 513, 519-523 [2021] [reviewing this Court's emotional injury jurisprudence]). First, in certain special circumstances—such as false reports of a family member's death or serious illness, or the mishandling of a family member's remains—a plaintiff may recover for emotional harm directly caused by a defendant's negligence (see Johnson v State of New York, 37 NY2d 378, 381-382 [1975]; see also Lynch v Bay Ridge Obstetrical & Gynecological Assoc., 72 NY2d 632, 635 [1988]; Martinez v Long Is. Jewish Hillside Med. Ctr., 70 NY2d 697, 699 [1987]; Lando v State of New York, 39 NY2d 803, 804-805 [1976]). Second, a plaintiff may recover where a defendant's breach of a duty of care unreasonably places the plaintiff in fear of physical harm, resulting in emotional harm with "physical manifestations" (Battalla, 10 NY2d at 238-239). Finally, a plaintiff may recover for the negligent infliction of emotional distress where they suffer emotional injury upon witnessing a physical injury to an immediate family member while the plaintiff is in the "zone of danger" created by the defendant's negligent conduct (see Bovsun v Sanperi, 61 NY2d 219 [1984]; see also Greene, 36 NY3d at 522-523). In applying these exceptions, we have repeatedly stressed their circumscribed nature and have remained "reluctant to permit recovery for negligently caused psychological trauma, with ensuing emotional harm alone" (Johnson, 37 NY2d at 381; see also Bovsun, 61 NY2d at 230-231).
These black-letter principles apply to parents' claims for emotional injury arising from the death or suffering of their child due to prenatal medical malpractice. In Howard v Lecher, we considered a claim for emotional damages brought by parents of an infant who succumbed to Tay-Sachs disease (see 42 NY3d at 110). The plaintiffs alleged that their doctor failed to advise them of the high risk of their daughter suffering from that disease, causing them emotional pain from witnessing their child suffer and die (id.). We held that the parents could not recover (id. at 113). In doing so, we rejected the dissent's proposed rule that the mother—but not the father—should recover because the treating doctor owed a duty of care to both mother and infant (see id. at 116-117 [Cooke, J., dissenting] ["That the infant may have suffered physical injury, while the mother solely psychic, is not to say that each, individually, could not seek redress against the physician for the particular type of damage he caused"]).
We then reaffirmed as much the following year, holding that while claims for pecuniary loss caused by wrongful birth [FN3] may be actionable, "this is not to say that plaintiffs may recover for psychic or emotional [*3]harm alleged to have occurred as a consequence of the birth" (Becker v Schwartz, 46 NY2d 401, 413 [1978]). Indeed, we noted that "the cognizability of [the plaintiffs'] actions for emotional harm is a question best left for legislative address" (id. at 415). Two years later, in Vaccaro v Squibb, we held once more that a mother could not recover for purely emotional harm arising from her child's physical injuries allegedly caused by prenatal medical care (see 52 NY2d 809, 810 [1980], citing Howard, 42 NY2d 109).
In Tebbutt v Virostek (65 NY2d 931 [1985]), the plaintiff mother similarly sued to recover for her "pain, severe disappointment, anxiety, despondency, bitterness and suffering" after her child was stillborn, allegedly due to negligent prenatal medical care (id. at 932). We deemed the cause of action barred by Vaccaro. Though New York law does not recognize wrongful death or life claims brought by the personal representative of a stillborn fetus (see Endresz v Friedberg, 24 NY2d 478, 484 [1969]; see also Woods v Lancet, 303 NY 349, 351 [1951] [child born alive may bring a medical malpractice action for physical injuries inflicted in the womb]), we were not swayed by the dissent's concern that dismissing the mother's claim would leave "no one who can recover for alleged wrongdoing, and free[ ] defendant from responsibility" (65 NY2d at 940 [Kaye, J., dissenting]; see also id. at 933 [Jasen, J., dissenting] ["the majority relegates the unborn child to a juridical limbo, where negligent acts, with fatal effect, performed upon the child are neither compensated nor deterred"]). We also rejected the argument that the claim fell within the zone of danger exception, because, for that exception to apply, "the observation [causing distress] must be contemporaneous with the conduct causing the injury or death" (id. at 932).
Two decades later, in Broadnax v Gonzalez, we revisited whether "a mother may recover damages for [purely] emotional harm when medical malpractice causes a miscarriage or stillbirth," and adopted the Tebbutt dissenters' view (2 NY3d 148, 151 [2004]). We again reaffirmed our "longstanding reluctance to recognize causes of action for negligent infliction of emotional distress, especially in cases where the plaintiff suffered no independent physical or economic injury" (id. 153). Nonetheless, we deemed it necessary to fill the anomalous gap—arising from the common-law bar on wrongful death or life claims on behalf of a stillborn fetus in combination with the common-law bar on claims for purely emotional damages—whereby a medical provider whose malpractice caused a stillbirth faced no liability at all (id. at 154). We thus overruled Tebbutt and held that "medical malpractice resulting in miscarriage or stillbirth should be construed as a violation of a duty of care to the expectant mother, entitling her to damages for emotional distress" (id. at 155). In doing so, we created a limited, sui generis exception to the bar on claims for purely emotional damages to ensure that medical professionals are not entirely immune from liability for malpractice resulting in a fetus's death and emphasized that even in those circumstances, limits on recovery remained (see id. at 155 n 4 [reiterating that unlike numerous other jurisdictions permitting recovery for negligently caused stillbirths or miscarriages, "we limit a mother's recovery only to damages for the emotional distress attending a stillbirth or miscarriage caused by medical malpractice . . . (and) do not depart from our holding . . . barring wrongful death actions under these circumstances"]).
Despite Broadnax's defined scope, some lower courts interpreted it as also allowing claims for purely emotional damages where medical malpractice causes injuries to a fetus in utero but born alive (see e.g. Sheppard-Mobley v King, 10 AD3d 70, 75 [2d Dept 2004], mod 4 NY3d 627; Stuart v New York City Health & Hosps. Corp., 7 Misc 3d 225, 226-228 [Sup Ct, Queens County 2005]). In Sheppard-Mobley, we unanimously clarified that Broadnax narrowly "permit[s] a cause of action where otherwise none would be available" (4 NY3d at 637). Accordingly, it does "not apply . . . where [the] infant . . . was injured in utero, but carried to term and born alive," because the infant may recover independently for medical malpractice that causes them physical injury (id.). We therefore held that lower courts had "improperly extended" Broadnax, which applied exclusively to claims arising from miscarriage or stillbirth (id.). Thus, we made clear that, under those circumstances, while a birthing parent may "seek[ ] damages for emotional harm . . . suffered as a result of an independent injury," they may not recover for purely emotional harm.
As outlined, our long-established precedent dictates that a birthing parent may not recover for their purely emotional suffering due to medical malpractice resulting in in-utero injuries to their child who is born alive.
III.
Initially, here, Supreme Court denied dismissal of plaintiff's medical malpractice claims on behalf of her son's estate. Those claims are not at issue in this appeal, and plaintiff may still ultimately recover for those injuries. Instead, our review is limited to whether the lower courts properly denied summary judgment dismissing plaintiff's cause of action for lack of informed consent on her own behalf. Plaintiff concedes that she did not suffer any physical injury that would permit recovery under ordinary tort principles. Instead, she argues that (1) Sheppard-Mobley does not bar her claim for purely emotional harm arising from lack of informed consent because it is distinguishable from a traditional medical malpractice claim, and (2) to the extent Sheppard-Mobley bars this claim, it should be overruled. We reject both arguments.
A.
Lack of informed consent is a distinct theory of medical malpractice liability rooted in a specific professional duty to reasonably inform and obtain consent from the patient. Though "[u]nder traditional tort law, medical treatment beyond the scope of a patient's consent was considered an intentional tort or a species of assault and battery," it is now treated as "a form of medical malpractice based on negligence" (Messina v Matarasso, 284 AD2d 32, 34 [1st Dept 2001]). In New York, recovery for such a claim is limited to circumstances defined by statute (see Public Health Law § 2805-d [1], [3]).
"To succeed in a medical malpractice cause of action premised on lack of informed consent, a plaintiff must demonstrate that (1) the practitioner failed to disclose the risks, benefits[,] and alternatives to the procedure or treatment that a reasonable practitioner would have disclosed and (2) a reasonable person in the plaintiff's position, fully informed, would have elected not to undergo the procedure or treatment" (Orphan v Pilnik, 15 NY3d 907, 908 [2010]).[FN4] A plaintiff must also prove that "the actual procedure performed for which there was no informed consent [was] a proximate cause of the injury" (Trabal v Queens Surgi-Center, 8 AD3d 555, 556-557 [2d Dept 2004]; see also PJI 2:150A).
Though Sheppard-Mobley involved a "traditional" medical malpractice claim, its holding was clear: a birthing parent may not "recover damages for emotional harm where . . . alleged medical malpractice causes in utero injury to the fetus, subsequently born alive" (4 NY3d at 634). As our case law and the Public Health Law make clear, a lack of informed consent claim is a type of medical malpractice claim (see Public Health Law § 2805-d [entitled, "Limitation of medical, dental or podiatric malpractice action based on lack of informed consent"]; Orphan, 15 NY3d at 908 [reciting elements of a "medical malpractice cause of action premised on lack of informed consent"]). Thus, a straightforward reading of Sheppard-Mobley forecloses plaintiff's claim.
Looking beyond the clear language of that opinion, there is no legal or logical reason to treat lack of informed consent claims differently from traditional medical malpractice claims for present purposes. Both seek recovery for injuries resulting from a medical procedure performed in breach of a professional duty. True, as the Appellate Division observed, the claims "comprise[ ] different elements" (229 AD3d at 158): traditional
medical malpractice requires a plaintiff to prove a breach of the duty of care, while lack of informed consent requires the plaintiff to prove a breach of the duty to inform. And yet neither plaintiff nor the Appellate Division explained why these technical distinctions are dispositive. At bottom, both claims arise from injury caused by a medical procedure performed in breach of a professional duty.[FN5]
Ultimately, in holding that informed consent and medical malpractice are distinguishable, the Appellate Division ignored the broader context of the general rule barring recovery for purely emotional damages, which long predated Sheppard-Mobley (see 229 AD3d at 170-171 [Renwick, P.J., dissenting]). The core question is whether plaintiff's claim for emotional injuries falls within any exception to that general rule. Because lack of informed consent claims are indistinguishable from traditional medical malpractice claims for purposes of that rule, our holding in Sheppard-Mobley forecloses any argument that the Broadnax exception governs, and our prior cases—reaffirmed in Sheppard-Mobley—confirm that no other exception applies.
B.
In the alternative, plaintiff and the Appellate Division invite us to overrule Sheppard-Mobley (see 229 AD3d at 6-10). Fatal to this argument is plaintiff's failure to demonstrate that anything decisive has changed in the 20 years since Sheppard-Mobley was unanimously decided.
The stare decisis doctrine instructs that courts should "overrule a prior decision" only "in the rarest of cases," when "an extraordinary combination of factors undermines" its "reasoning and practical viability" (Matter of Brooke S.B. v Elizabeth A.C.C., 28 NY3d 1, 23 [2016]). In conducting this analysis, we often ask whether our "prior holding leads to an unworkable rule, or creates more questions than it resolves"; whether "adher[ing] to a recent precedent involves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience"; and whether "a preexisting rule, once thought defensible, no longer serves the ends of justice or withstands the cold light of logic and experience" (People v Peque, 22 NY3d 168, 194 [2013] [internal quotation marks and ellipsis omitted]). We have also emphasized that "stare decisis is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable" (People v Bing, 76 NY2d 331, 338 [1990] [internal quotation marks and emphasis omitted]), and that while "a court should be slow to overrule its precedents, there is little reason to avoid doing so when persuaded by the lessons of experience and the force of better reasoning" (id. [internal quotation marks omitted]). "That may be especially true of tort cases, including personal injury cases, which offer an example where courts will, if necessary, more readily re-examine established precedent to achieve the ends of justice" (Flanders v Goodfellow, 44 NY3d 57, 67 [2025] [internal quotation marks and brackets omitted]). Thus, we have overruled cases where a tort "rule of nonliability is out of tune with the life about us, at variance with modern-day needs and with concepts of justice and fair dealing" (Bing v Thunig, 2 NY2d 656, 667 [1957]). But "even under the most flexible version of the doctrine of stare decisis, prior decisions should not be overruled unless a compelling justification exists for such a drastic step" (Grady v Chenango Val Cent Sch. Dist., 40 NY3d 89, 96 [2023] [internal quotation marks and alterations omitted], quoting State Farm Mut. Auto. Ins. Co. v Fitzgerald, 25 NY3d 799, 819 [2015]).
None of these considerations warrants overruling Sheppard-Mobley. Its rule is logical and fits comfortably within New York's tort jurisprudence disfavoring recovery for purely emotional injuries. The Appellate Division suggested that it subjects plaintiffs to arbitrary limits when contrasted with Broadnax (see also Rivera, J., dissenting op at 27). But that difference is not arbitrary: we permitted the recovery of purely emotional damages in Broadnax only because otherwise, under New York law, there could be no recovery at all, immunizing doctors from their malpractice. Under Sheppard-Mobley, a doctor is liable for negligence resulting in an infant's death after birth, such that there is no gap in liability and thus no need to avoid such perverse incentives.
Further, plaintiff has not identified any difficulty in applying Sheppard-Mobley's simple and straightforward bright-line rule. Nor has jurisprudence in this area evolved since we last decided the issue: most of the out-of-jurisdiction cases plaintiff cites adopting a contrary rule predate Sheppard-Mobley, and therefore do not evidence the type of progress or new justification that would warrant charting a new course (see Carey v Lovett, 132 NJ 44, 622 A2d 1279 [1993]; Burgess v Superior Court of Los Angeles County, 2 Cal 4th 1064, 831 P2d 1197 [1992]; Modaber v Kelley, 232 Va 60, 348 SE2d 233 [1986]; see also Broadnax, 2 NY3d at 155 n 4). While the Connecticut Supreme Court recently allowed recovery in these circumstances (see Escobar-Santana v State, 347 Conn 601, 298 A3d 1222 [2023]), Connecticut, unlike New York, has long been more amenable to allowing recovery for emotional damages (see e.g. Clohessy v Bachelor, 237 Conn 31, 675 A2d 852 [1996] [adopting the expansive bystander theory of recovery rejected in Greene]).
The facts of this case are tragic, and the emotional pull to recognize the remedy plaintiff seeks is undeniable. But we ultimately are not persuaded that Judge Rivera's thoughtful case for overturning Sheppard-Mobley (see Rivera, J., dissenting op at 23-30) provides sufficient justification under our stare decisis principles to abandon this relatively recent and unanimous precedent. Our disagreement largely centers on our adherence to our consistent characterization of Broadnax as a narrow fix for a discrete legal problem (see Sheppard-Mobley, 4 NY3d at 637; Broadnax, 2 NY3d at 154-155; supra at 8-9) rather than fundamentally altering the trajectory of our tort law by allowing broader recovery for purely emotional damages (see Rivera, J., dissenting op at 15-17, 22-24).
The other dissent similarly concludes, based on the same mistaken reading of Broadnax, that a birthing parent's purely emotional suffering warrants legal redress (see Wilson, Ch. J., dissenting op at 2-3). But that dissent would—in an unworkable effort to dodge stare decisis principles—only provide this redress if a factfinder ultimately determines that the birthing parent's suffering was worse (in dollar terms) than their child's (see Wilson, Ch. J., dissenting op at 10-14; but see 3 [characterizing substituting one theory of recovery for the other as "intellectually incoherent"]). According to Chief Judge Wilson, a child born alive who quickly succumbs to prenatal injuries should be treated as legally equivalent to a stillborn fetus under Broadnax because a wrongful death claim on their behalf is unlikely to result in significant monetary recovery due to the child's short life (Wilson, Ch. J., dissenting op at 10-12). He thus proposes deeming certain liveborn babies constructively dead at birth. But to avoid forcing parties and judges to engage in the grotesque exercise of deciding when to do so—and unable to conjure any viable standard to govern that wholly unprecedented inquiry (Wilson, Ch. J., dissenting op at 13-14)—the dissent proposes allowing a plaintiff to pursue both remedies through trial and keep only the higher monetary award (Wilson, Ch. J., dissenting op at 13-14).
This proposal is profoundly flawed. It is typically for the courts and the legislature—not juries—to define the legal remedies that are available to a party. Turning that principle on its head could have untold consequences. Moreover, it would be reckless to adopt an entirely untested theory equating a fetus with an infant in this context without carefully considering its ramifications on reproductive and other rights. Indeed, it is the product of pure judicial invention, not advanced by any party, and therefore antithetical to the principles of judicial restraint that the dissent purports to serve (see Wilson, Ch. J., dissenting op at 1-2, 13).
In sum, because we have not been presented with a sufficient justification to overrule Sheppard-Mobley, we decline plaintiff's and the Appellate Division's invitation to do so.
IV.
New York's long-established skepticism of claims for purely emotional damages necessarily prohibits some plaintiffs with emotional injuries from recovering for that harm.
We have already decided that the bar on purely emotional damages applies in cases like this one. Reversing course by creating an ad hoc exception to this rule would only engender the very inconsistency and confusion that our adherence to precedent seeks to avoid.
Accordingly, the order of the Appellate Division, insofar as appealed from, should be reversed, with costs, plaintiffs' fourth cause of action for lack of informed consent against defendant Meryl Y. Grimaldi dismissed, and the certified question answered in the negative.

RIVERA, J. (dissenting):

Consider the following two cases. In the first, a mother gives birth to a child who dies 15 minutes later due to severe physical and neurological impairments, allegedly caused by a medical practitioner in the course of prenatal treatment of the mother and fetus. The mother suffers significant emotional damages, including post-traumatic stress disorder (PTSD), from the experience of birthing a child whose injuries and death are directly attributable to medical malpractice and files an action against the practitioner. According to the majority, unless the mother also alleges that the practitioner's negligence caused her to suffer a separate physical injury, even if that injury is minor and impermanent, she cannot recover for her severe, long-term psychological damage. Now consider the second case, which is identical to the first, except that the practitioner's alleged medical malpractice causes a stillbirth, rather than death 15 minutes after birth. According to the majority, the mother in this case has a cause of action to recover her emotional damages.
The disparate treatment of these two mothers, each of whom suffered substantial emotional injuries as a result of her practitioner's violation of the same duty of care, is the result of the Court's holding in Sheppard-Mobley v King (4 NY3d 627 [2005]), which drew an arbitrary line between a live birth and stillborn delivery. Sheppard-Mobley's rule, which bars a small subclass of plaintiff mothers from recovery for emotional harm, is contrary to tort doctrine and rooted in public policy concerns first articulated over a century ago and have since never been corroborated. The holding cannot be justified by logic, coherent reasoning, or traditional tort law principles. It is also out of line with an emerging scientific consensus about the trauma associated with childbirth and the physical manifestations of illnesses like PTSD, along with our evolving tort jurisprudence more generally.
It is time to overrule Sheppard-Mobley and allow mothers to recover emotional damages caused by medical providers who violate their duty of care during the course of prenatal treatment and birth, without distinguishing between live births and stillbirths. I dissent.
[*4]I.
In Woods v Lancet (303 NY 349 [1951]), this Court overturned the bar to recovery for prenatal injuries that it set in Drobner v Peters (232 NY 220 [1921]). In Drobner, the Court held that the infant plaintiff could not recover for injuries suffered in utero when his mother tripped on a negligently uncovered hole in the sidewalk (232 NY at 223-224). The Drobner Court adopted the reasoning of an 1884 Massachusetts case where that court also denied an infant plaintiff recovery of damages suffered in utero (id. at 221, citing Dietrich v Northampton, 138 Mass 14 [1884] [Holmes, J.]). The Massachusetts court reasoned that "the unborn child was a part of the mother at the time of the injury," and "any damage to [them] which was not too remote to be recovered for at all was recoverable by her" (Dietrich, 138 Mass at 17). The Drobner Court also observed that "[t]he great weight of authority is still against the [infant] plaintiff's contention that the unborn child has a right of immunity from personal harm" (232 NY at 221). In Woods, as now, the Court had to weigh the continuing vitality of its common law precedent, asking pointedly, "shall we follow Drobner v. Peters, or shall we bring the common law of this State, on this question, into accord with justice?" (303 NY at 351). It chose the latter. Now, as in Woods, we should right the ship and direct our common law towards a just application of tort law principles.
The majority's brief summary of the case law on recovery of emotional damages does not fully capture the evolution of our common law in this area. We need to look closely at the inflection points in that development to understand where we are today. As I discuss here, although the Court has historically been wary of, and at times hostile to, causes of action seeking relief for emotional damages, it has consistently moved in the direction of recognizing such claims.
A.
In Mitchell v Rochester Ry. Co., the Court adopted the approach that English courts had taken and held that a plaintiff cannot recover solely emotional damages (151 NY 107, 109 [1896]). In that case, the plaintiff filed a tort action after one of the defendant's horse-driven cars came so close to her "that she stood between the horses' heads when they were stopped," causing her "fright and excitement," which she alleged, in turn, caused her to suffer a miscarriage and "consequent illness" (id. at 108-109). In holding that the plaintiff could not recover for emotional damages absent a physical injury, the Court explained that although "the authorities are not harmonious . . . the most reliable and better considered cases, as well as public policy," supported its conclusion (id. at 109). The Court explained as a matter of public policy that allowing plaintiffs to recover solely emotional damages "would naturally result in a flood of litigation in cases where the injury complained of may be easily feigned without detection, and where the damages must rest upon mere conjecture or speculation" (id. at 110).
Not long after Mitchell, New York courts recognized the harshness of the Mitchell rule and the lack of support for the public policy concerns raised therein. Courts began to mitigate its effects by adopting exceptions, beginning a more than century-long process of evolving the common law to achieve the ends of justice. The most prominent of the initial exceptions was the "slight impact" rule, which the Court first recognized in Comstock v Wilson (257 NY 231 [1931]). The Comstock Court declared that "where there has been a physical impact, even though slight, accompanied by shock, there may be a recovery for damages to health caused by the shock, even though that shock was the result produced by the impact and fright concurrently" (id. at 237). The intermediate appellate courts had previously adopted this approach in the aftermath of Mitchell, allowing recovery for emotional damages if the plaintiff asserted any slight physical impact (see e.g. Jones v Brooklyn Hgts. R.R. Co., 23 AD 141, 144 [2d Dept 1897] [affirming the plaintiff's recovery of emotional damages for shock caused when a lightbulb in one of the defendant's cars fell and struck her temple, also causing bruising]). In adopting the slight impact rule, the Comstock Court again noted "the practical consideration that where there has been no physical contact there is danger that fictitious claims may be fabricated" (257 NY at 239). The Court distinguished slight impact cases on the basis that an impact means " 'the reality of the cause is guaranteed' " (id. at 238, quoting Homans v Boston Elevated Ry. Co., 180 Mass 456, 458 [1902] [Holmes, J.]). Additionally, the Court characterized Mitchell's holding as [*5]deciding that "for practical reasons there is ordinarily no duty to exercise care to avoid causing mental disturbance, . . . [s]erious consequences from mere mental disturbance unaccompanied by physical shock cannot be anticipated, and no person is bound to be alert to avert a danger that foresight does not disclose" (id. at 238-239). By contrast, when the defendant's conduct causes a physical impact, they may have breached a duty of care owed to the plaintiff (see id. at 239).
New York courts continued to develop exceptions to Mitchell's prohibition, permitting recovery for purely emotional harm under certain circumstances, often treating the plaintiff's cause of action as falling within a different legal framework entirely (see e.g. Gillespie v Brooklyn Hgts. R.R. Co., 178 NY 347, 363 [1904] [plaintiff may recover emotional damages for breach of contract when an employee of a common carrier uses abusive and offending language]; Barrington v Hotel Astor, 184 AD 317, 322 [1st Dept 1918] [plaintiff may recover emotional damages where the hotelkeeper violated its implied warranty that their food was safe to eat, but in which plaintiff discovered a mouse corpse, causing them to fall ill]; Gostkowski v Roman Catholic Church, 262 NY 320, 325 [1933] [affirming that a surviving spouse can recover for damages caused by the arbitrary interference with a deceased spouse's remains]). However, the exceptions to Mitchell's bar failed to provide adequate compensation for tortious conduct, and they simultaneously increased the potential for exaggerated claims, even by plaintiffs genuinely harmed, in order to "fit" within the legal framework. As the New York Law Revision Commission noted in its 1936 report, "exceptions to the [Mitchell] rule cannot be said to insure recovery to any substantial number of meritorious claimants and there is good ground for believing that they breed dishonest attempts to mold the facts so as to fit them within the grooves leading to recovery" (1936 Report of N.Y. Law Rev. Commn. at 450). In other words, the Commission believed that the Mitchell rule had the perverse effect of incentivizing fraudulent claims by leading plaintiffs to shape the facts of their claims to fall within a ballooning set of exceptions, all while denying honest plaintiffs from recovery for real emotional injuries.
In 1961, the Court ultimately overruled Mitchell in Battalla v State of New York, representing a necessary escalation in its jurisprudence toward recognizing claims for emotional damages (10 NY2d 237, 239 [1961]). The Court concluded "that a rigorous application of [Mitchell's] rule would be unjust, as well as opposed to experience and logic," and that "resort to the somewhat inconsistent exceptions would merely add further confusion to a legal situation which presently lacks that coherence which precedent should possess" (id.). After noting that the English courts that initially developed the no-recovery rule, as well as a majority of American jurisdictions and scholars, have since rejected it, the Court grounded its analysis in the fundamental common law right to recovery for injuries incurred (id. at 239-240). The Court explained, "[i]t is fundamental to our common-law system that one may seek redress for every substantial wrong [and] that a wrong-doer is responsible for the natural and proximate consequences of [their] misconduct; and what are such consequences must generally be left for the determination of the jury" (id. at 240 [internal quotation marks omitted]).
The Battalla Court rejected the previously-invoked public policy arguments against recovery of solely emotional damages as unsupported by experience and logic. It reasoned:
"Although fraud, extra litigation and a measure of speculation are, of course, possibilities, it is no reason for a court to eschew a measure of its jurisdiction. The argument from mere expediency cannot commend itself to a Court of justice, resulting in the denial of a logical legal right and remedy in all cases because in some a fictitious injury may be urged as a real one" (Battalla, 10 NY2d at 240-241 [internal quotation marks omitted]).
The Court noted that Mitchell's prohibition failed on its own terms, because "fraudulent accidents and injuries are just as easily feigned in the slight-impact cases and other exceptions wherein New York permits a recovery, as in the no-impact cases which it has heretofore shunned" (id. at 241 [footnotes omitted]). Citing the 1936 Law Revision Commission's observation, the Court stated the obvious: that "[t]he ultimate result is [*6]that the honest claimant is penalized for [their] reluctance to fashion the facts within the framework of the exceptions" (id.). Thus, Mitchell incentivized litigants to either "perjure themselves" or make "constant attempts to either come within an old exception, or establish a new one, lead[ing] to excess appellate litigation" (id.). Additionally, even if overturning Mitchell caused a "flood of litigation . . . it is the duty of the courts to willingly accept the opportunity to settle these disputes" (id. at 241-242).
The Battalla Court further determined that Mitchell's "only substantial policy argument . . . that damages or injuries are somewhat speculative and difficult to prove" was no ground to bar recovery (10 NY2d at 242). First, evidentiary challenges in an individual case should not foreclose an entire class from seeking relief for tortious conduct (see id.). Second, the legal system is capable of distinguishing meritorious and meritless claims, as it does in all other areas of law:
"In many instances, just as in impact cases, there will be no doubt as to the presence and extent of the damage and the fact that it was proximately caused by defendant's negligence. In the difficult cases, [the Court] must look to the quality and genuineness of proof, and rely to an extent on the contemporary sophistication of the medical profession and the ability of the court and jury to weed out the dishonest claims" (id. [footnote omitted]).
In the early half of the 20th century, then, the history of this Court was varied. The Court first held the view that plaintiffs would overwhelm our courts with actions for potentially feigned emotional injuries. The Court then recognized that emotional injuries are as real as any physical injury, and that the fear of a judicial system overrun by claims for solely emotional damages was speculative and, in any case, not a sufficient basis to deny recognition of such claims.
Since Battalla, the Court has continued to expand access to recovery in cases alleging only emotional damages. In Johnson v State of New York, the Court held that the plaintiff daughter could recover emotional damages caused by the defendant hospital when it negligently misinformed her that her mother, a patient, had died (37 NY2d 378, 379-380 [1975]). The Court explained that the "[k]ey to liability, of course, is the hospital's duty, borne or assumed, to advise the proper next of kin of the death of a patient" (id. at 380). It concluded that "[t]he consequential funeral expenditures and the serious psychological impact on [the plaintiff] of a false message informing her of the death of her mother, were all within the 'orbit of the danger' and therefore within the 'orbit of the duty' for the breach of which a wrongdoer may be held liable" (id. at 382-383, quoting Palsgraf v Long Is. R.R. Co., 248 NY 339, 343 [1928] [Cardozo, C.J.]). Once the plaintiff established a duty of care and a breach of that duty, she was "entitled to recover the proven harmful consequences proximately caused by the breach," including emotional damages (id. at 283; see also Lando v State of New York, 39 NY2d 803, 805 [1976] [holding that the plaintiff parent could recover damages "for the mental anguish he suffered when, solely by reason of the hospital's negligence, he was denied access to and control over the body of his deceased daughter for a period of 11 days"]).
In 1983, two decades after the Court overturned Mitchell, it identified in Kennedy v McKesson Co. three lines of case law, of which two recognize recovery for emotional damages (58 NY2d 500, 504-506 [1983]). One line of cases recognizes a cause of action for emotional damages even absent physical injury, where the defendant owes a duty to the plaintiff and breach of the duty directly causes a psychological injury (id. at 504-505, citing Battalla, Johnson, and Lando). In those cases, the Court held that "sophistication of the medical profession and the likelihood of genuine and serious mental distress arising from the circumstances of the case warranted allowing the jury to weed out spurious claims, though there was no contemporaneous physical harm to provide an index of reliability" (id. at 505). A second line of cases applies the "zone of danger" rule, which permits a plaintiff at risk of physical injury from a defendant's negligence to recover purely emotional damages resulting from their observations of the serious physical injury or death [*7]of an immediate family member due to that same negligence (see id.).[FN1] A third set of cases rejects claims for emotional damages upon a violation of a duty of care to the plaintiff that results in physical injury to a third person (see id. at 505-506, citing Howard v Lecher, 42 NY2d 109, 113 [1977]). Recognizing such claims "would have inevitably led to the drawing of artificial and arbitrary boundaries" (id. at 506 [internal quotation marks omitted]). The Kennedy Court concluded that "[t]he rule to be distilled from those [lines of] cases is that there is no duty to protect from emotional injury a bystander to whom there is otherwise owed no duty, and, even as to a participant to whom a duty is owed, such injury is compensable only when a direct, rather than a consequential, result of the breach" (id.).
B.
Just as the Court's jurisprudence on emotional damages evolved, so too did its jurisprudence on an infant plaintiff's access to damages for injuries sustained in utero. As discussed, in Woods, decided 10 years before Battalla, the Court overruled Drobner and held that an infant plaintiff could sue for injuries caused in utero by the defendant's negligence (303 NY at 351). The Court explained that "as an original proposition, [it] would, today, be hard put to it to find a sound reason for the old rule" (id. at 354). As in Battalla, the Court rejected the policy justifications underlying Drobner, which were the "supposed difficulty of proving or disproving that certain injuries befell the unborn child, or that they produced the defects discovered at birth, or later," reasoning that such "difficult[ies] of proof" are "not special to this particular kind of lawsuit" and "beside the point . . . in determining sufficiency of a pleading" (id. at 356). Again, mirroring Battalla, the Court explained, "[e]very day in all our trial courts . . . such issues are disposed of, and it is an inadmissible concept that uncertainty of proof can ever destroy a legal right" (id.).
In Endresz v Friedberg, the Court limited the potential scope of Woods by holding that a personal representative of a stillborn fetus that died from in utero injuries cannot recover under New York's wrongful death statute (24 NY2d 478, 486-487 [1969]). The Court contrasted such circumstances with Woods on the basis that a fetus "deprived of life while yet unborn, is never faced with the prospect of impaired mental or physical health" (id. at 483). Where a medical provider's negligence causes a stillbirth, "the damages recoverable by the parents in their own right afford ample redress for the wrong done" (id. at 486). As the parents had a remedy, allowing them to additionally recover under the wrongful death statute would give them "an unmerited bounty and would constitute not compensation to the injured but punishment to the wrongdoer" (id. at 484). That result is contrary to established first principles: " '[a] fundamental basis of tort law is the provision for compensation of an innocent plaintiff for the loss [they] ha[ve] suffered. Tort law is not, as a general rule, premised upon punishing the wrongdoer' " (id., quoting David A. Gordon, The Unborn Plaintiff, 63 Mich L Rev 579, 594-595 [1965]). Thus, critical to the Endresz Court's holding was the core assumption that a parent can recover in their own right for their own damages—an assumption that, as described below, Sheppard-Mobley undermined (see Section IV, infra).
C.
Starting with Tebbutt v Virostek (65 NY2d 931 [1985]), the Court issued the first of three opinions defining a mother's cause of action for recovery of her emotional damages caused by prenatal injury to the fetus. In Tebbutt, the Court held in a memorandum decision short on analysis, but long in impact, that the plaintiff mother could not recover for her "pain, severe disappointment, anxiety, despondency, bitterness and suffering' attendant upon the stillbirth of her child," allegedly caused by the defendant's negligent administration of an amniocentesis (id. at 932 [internal quotation marks omitted]).[FN2] The Court distinguished Johnson on the unexplained and plainly incorrect ground that the mother "failed to establish the existence of a duty running from [the] defendant to [herself]" (id. at 932-933). It also concluded that the mother could not [*8]recover under the zone of danger rule because she failed to allege that her observations were contemporaneous with the defendant's injury-causing conduct (id. at 932). However, the Court failed to explain how a pregnant mother could "observe" an injury inflicted on a fetus in utero, or why she would not always be within the zone of danger for an injury to the fetus.
Two pointed dissents criticized the reasoning and unjust result in Tebbutt. Judge Jasen wrote that the case law, including Johnson, had recognized recovery of emotional damages even without allegations of physical injury and that the defendant owed the mother "an absolute duty of care" (Tebbutt, 65 NY2d at 935-936 [Jasen, J., dissenting] ["The interests of the mother and the unborn child are intertwined by nature during the mother's pregnancy. Due to these relationships, a tortious act, which results in the death of an unborn child, represents a breach of a direct duty to the mother"]). Judge Jasen observed that the majority's holding "effectively immunize[d] the defendant from all liability for his negligent conduct with fatal effect," because, as the Court held in Endresz, the stillborn child's representative could not bring a wrongful death claim (id. at 937-938). The majority's holding was inconsistent with Endresz, which "manifestly contemplated a mother's recovery for her own mental and physical injuries immediately arising from [a] stillbirth[ ]," and it led to the "anomalous situation" that "liability is imposed where [the] defendant's negligence caused mere injury to the subsequently born child, while all liability evaporates when the negligence has had fatal effect" (id. [internal citation omitted]). In a separate dissent, then-Judge Kaye objected to the same result, writing that it "free[d] defendant from responsibility," even though the defendant could have been liable if the child had been born alive (id. at 940 [Kaye, J., dissenting]). Judge Kaye concluded that "[w]here the law declares that the stillborn child is not a person who can bring suit, then it must follow in the eyes of the law that any injury here was done to the mother" (id.).
In 2004, almost 20 years after Tebbutt, in the companion cases of Broadnax v Gonzalez and Fahey v Canino, the Court overturned it (2 NY3d 148, 151-153 [2004]). In each case, the plaintiff mothers sued to recover emotional damages for alleged medical malpractice causing a miscarriage or stillbirth (id. at 151-152). The Court recognized, along the same lines as the dissenters in Tebbutt, that the Tebbutt rule "fit[ ] uncomfortably into [its] tort jurisprudence," because it allowed an infant born alive but injured in utero, and their pregnant mother, to sue for their respective independent injuries, but failed to recognize a parent's wrongful death cause of action based on miscarriage or stillbirth (id. at 154). Tebbutt had the effect of "immuniz[ing medical providers] against any liability when their malpractice caused a miscarriage or stillbirth," while denying "a narrow, but indisputably aggrieved, class of plaintiffs" access to redress (id.). The Court decried that "peculiar result" as one "at odds with the spirit and direction of [the Court's] decisional law in this area" (id.).
In Broadnax, the Court filled what it called the "logical gap" that Tebbutt created by denying both the stillborn fetus and the mother a path to recover damages from a medical provider's alleged malpractice (2 NY3d at 154, citing Tebbutt, 65 NY2d at 933 [Jasen, J., dissenting]). It recognized that the injury to be compensated " 'was done to the mother' " (id., citing Tebbutt, 65 NY2d at 940 [Kaye, J., dissenting]). The Court separately clarified that a medical provider owes a duty of care to both an unborn fetus and a mother: "[a]lthough, in treating a pregnancy, medical professionals owe a duty of care to the developing fetus . . . they surely owe a duty of reasonable care to the expectant mother, who is, after all, the patient. Because the health of the mother and fetus are linked, [the Court] will not force them into legalistic pigeonholes" (id. at 154-155 [footnote and internal citation omitted]). Thus, "even in the absence of an independent injury, medical malpractice resulting in miscarriage or stillbirth should be construed as a violation of a duty of care to the expectant mother, entitling her to damages for emotional distress" (id. at 155).
Lower courts interpreted Broadnax as permitting a mother's cause of action to recover for emotional damages from a miscarriage or stillbirth allegedly caused by the defendant's medical malpractice, even absent an independent physical injury (see e.g. Kotler v Swersky, 10 AD3d 350, 351-352 [2d Dept 2004]; Khanra v Mogilyansky, 206 AD3d 985, 986 [2d Dept 2022]). Indeed, the plaintiff mothers in Broadnax each [*9]asserted claims for emotional harm caused by her respective miscarriage or stillbirth, without alleging independent physical injury (2 NY3d at 152-153).
One year after the Court decided Broadnax, it retreated from the underlying premise of those cases—that the medical practitioner owed the pregnant mother patient a duty of care—and held in Sheppard-Mobley that a mother could not recover for her own emotional damages if her child was born alive (4 NY3d at 634). In that case, the plaintiff mother obtained a nonsurgical abortion from the defendant doctor, who administered a drug called methotrexate (id. at 635). Months later, the mother learned that the abortion procedure had failed, allegedly because the doctor gave her an insufficient dose of the drug (id.). The mother carried her child to term, but due to his in utero exposure to methotrexate, he was born with "fetal methotrexate syndrome, manifested through serious congenital impairments" (id.). In addition to asserting claims on behalf of the infant, the mother sought to recover for emotional damages that she alleged were caused by the defendant's malpractice (id. at 636).
The Court distinguished Broadnax on the basis that in those cases, the fetuses did not survive childbirth (4 NY3d at 636). It reasoned that Broadnax was a narrow holding, "intended to fill a gap" created by Tebbutt, by "permit[ting] a cause of action where otherwise none would be available to redress the wrongdoing that resulted in a miscarriage or stillbirth" (id. at 637). Since the infant in Sheppard-Mobley survived childbirth and could thus assert his own medical malpractice claim for injuries sustained in the womb, the Broadnax/Fahey rule would serve no purpose and therefore did not apply (id.).[FN3]
Based on the facts of Sheppard-Mobley, the mother appeared to raise a claim that should be recognized under general tort law principles: she sued her medical providers for emotional damages stemming from their alleged breach of a duty of care to her that caused her emotional injury. The Broadnax Court did not assert that a medical provider's duty of care to a pregnant mother depends on whether her child is born alive, nor would such a distinction make logical sense. However, the Sheppard-Mobley Court elided the "fundamental basis of tort law" to compensate "an innocent plaintiff for the loss [they] ha[ve] suffered" (Endresz, 24 NY2d at 484). Instead, the Court held that Broadnax was only intended to ensure that a defendant can be held responsible (4 NY3d at 637). As this discussion shows, that decision steered our tort law off course.
II.
With that background, I now turn to the appeal before us.[FN4] The facts, as alleged, are tragic. Plaintiff Veronica SanMiguel was admitted to defendant St. Barnabus Hospital when she was 41 weeks pregnant and one week past her due date. Defendant Dr. Meryl Grimaldi made several efforts to induce labor. After 42 hours of unsuccessful attempts at a vaginal delivery, including two failed attempts at a vacuum extraction, Dr. Grimaldi performed an emergency cesarean section. Immediately upon delivery, plaintiff's baby boy had no heart rate, and he was resuscitated, intubated, and underwent chest compressions. Within five minutes, the infant's heartrate exceeded 100 beats per minute, but he remained unresponsive. His Apgar scores were zero, three, and four at one, five, and 10 minutes, respectively.[FN5] Hospital staff took the infant to the neonatal [*10]intensive care unit and placed him on a ventilator. A neonatal physician advised plaintiff and her spouse that the infant would possibly be on life support for the rest of his life. Approximately two hours later, the infant experienced seizures, which required two doses of medication. X-rays revealed that the infant had internal injuries. The infant remained unresponsive, and he was transferred to Montefiore Medical Center for additional care.
On the eighth day of his life, the infant was taken off life support and he passed away. His cause of death was recorded as neonatal encephalopathy, a syndrome characterized by abnormal neurological function during the newborn's first days of life. The most frequent cause of the syndrome is oxygen deprivation during pregnancy or birth (see Tampa General Hospital, Neonatal Encephalopathy, https://www.tgh.org/institutes-and-services/conditions/neonatal-encephalopathy [accessed Sept. 24, 2025]).
Plaintiff sued defendants Dr. Grimaldi and St. Barnabus Hospital on her own behalf and as administrator for the infant's estate. As relevant to this appeal, plaintiff asserted that she suffered personal emotional damages because Dr. Grimaldi failed to timely perform the cesarean section, and because Dr. Grimaldi performed two vacuum extraction procedures without her informed consent, causing the infant's injuries. At her deposition, plaintiff stated that as a result of her experience, she was diagnosed with PTSD, depression, and anxiety. She received weekly treatment at a hospital, and during the following year, she was involuntarily committed to the hospital for five days after the medications she was taking stopped working. Upon discharge from the hospital, plaintiff received outpatient psychiatric therapy, and she was re-prescribed Klonopin, an anti-anxiety and seizure medication, after she began having "a lot of panic attacks."
Due to her emotional condition, plaintiff was unable to return to work or socialize. She explained that the sight of children triggered her anxiety because it "remind[ed] [her] of [her] child, and what [she] could have had, and what [she was] missing out on on being a mother." She also stated that she cried daily and experienced physical manifestations of her emotional trauma, including that hives and rashes would break out all over her body when she felt elevated levels of stress. Those physical symptoms made it difficult for plaintiff to work, and she quit a job after three weeks because triggers would cause her to break out in rashes on her commute to the office, and when she got to work, she was further triggered by seeing photographs of her colleagues' children.
The Appellate Division, with one Justice dissenting, affirmed in part Supreme Court's partial denial of Dr. Grimaldi's summary judgment motion and complete denial of St. Barnabus's summary judgment motion (229 AD3d 152, 170 [2024]). It then granted both defendants leave to appeal and certified to us the question of whether its order was properly made. I would affirm, but on different grounds. I agree with the Appellate Division majority that it is time to revisit Sheppard-Mobley. Upon close consideration of our precedent, and guided by principles of tort law and stare decisis, I would overrule that case.
III.
"The doctrine of stare decisis provides that once a court has decided a legal issue, subsequent appeals presenting similar facts should be decided in conformity with the earlier decision" (People v Bing, 76 NY2d 331, 337-338 [1990]). "Its purpose is to promote efficiency and provide guidance and consistency in future cases by recognizing that legal questions, once settled, should not be reexamined every time they are presented" (id. at 338). However, "[s]tare decisis is not an inexorable command' " (Flanders v Goodfellow, — NY3d &mdash, &mdash, 2025 NY Slip Op 02261, *5 [2025], quoting Payne v Tennessee, 501 US 808, 828 [1991]). "Precedents remain precedents . . . not because they are established but because they serve the underlying nature and object of the law itself, reason and the power to advance justice (Bing, 76 NY2d at 338, quoting Robert von Moschzisker, Stare Decisis in Courts of Last Resort, 37 Harv L Rev 409, 414 [1924] [internal quotation marks omitted]). Stare decisis is " 'a principle of policy and not a mechanical formula of adherence [*11]to the latest decision, however recent and questionable' " (id., quoting Helvering v Hallock, 309 US 106, 119 [1940]).
Accordingly, the Court has overturned precedent when policy reasons, specific to the case, counsel in favor of doing so. The Court has overturned precedent when its application "would be unjust, as well as opposed to experience and logic" (Battalla, 10 NY2d at 239 [overturning Mitchell]). It has overturned precedent when the "chief basis" for its holding "no longer exists," leaving no "sound reason" to maintain it (Woods, 303 NY at 354 [overturning Drobner]). It has overturned precedent that "engendered a peculiar result" (Broadnax, 2 at 154 [overturning Tebbutt]). And it has overturned precedent that experience showed to be "in tension with ordinary tort principles," making it "unworkable, and, in some cases, unfair" (Flanders, 2025 NY Slip Op at *1 [overturning Bard v Jahnke, 6 NY3d 592 (2006)]).
Judge-made tort rules, especially those that bar recovery for personal injury, are appropriate subjects for reconsideration; they "offer an[] example where courts will, if necessary, more readily re-examine established precedent to achieve the ends of justice' " (Flanders, 2025 NY Slip Op at *5, quoting People v Hobson, 39 NY2d 479, 489 [1976]). The Court has thus rejected the notion that revisiting precedent in such cases is a matter for the Legislature. As the Court explained in Woods, "[l]egislative action there could, of course, be, but [the Court] abdicate[s] [its] own function, in a field peculiarly nonstatutory, when [it] refuse[s] to reconsider an old and unsatisfactory court-made rule" (303 NY at 355). Put another way, the Court "act[s] in the finest common-law tradition when [it] adapt[s] and alter[s] decisional law to produce common-sense justice" (id.).
IV.
Our common law tort system is intended to compensate injured parties, not punish wrongdoers (see Endresz, 24 NY2d at 484). Compensation has the potential added benefit, in appropriate cases, of deterring tortious behavior (see Restatement [Third] of Torts: Remedies [Tent Draft No. 1] § 2 [d] ["The risk of being sued and having to pay compensatory damages has the additional benefit of deterring tortious behavior. Compensation of plaintiffs and deterrence of defendants are so tightly connected in tort law that both may be viewed as fundamental purposes of compensatory damages in tort"]).
The general principles of negligence claims in tort law are well settled and based on four elements: (1) the existence of a duty of care from a defendant to the plaintiff, (2) breach of that duty, (3) a causal connection between the breach and the plaintiff's injury, and (4) damages intended to compensate the plaintiff for their loss (see Pasternak v Laboratory Corp. of Am. Holdings, 27 NY3d 817, 825 [2016]). Sheppard-Mobley is in contravention of these basic principles.
First, there is no dispute that a medical provider owes a duty of care throughout a mother's pregnancy, based on the provider-patient relationship, regardless of whether she experiences a miscarriage or stillbirth (see Broadnax, 2 NY3d at 155). Second, a medical provider's negligent treatment of a mother during pregnancy, which results in an injury to the fetus, is a breach of the duty of care to the mother (see id. ["Because the health of the mother and fetus are linked, we will not force them into legalistic pigeonholes"]). Third, a prenatal tort can cause a mother emotional or psychological harm caused by the injury to the fetus, and that harm is not diminished or erased by a live birth. Lastly, damages for a mother's physical and emotional harm are intended to compensate her, not to punish the medical practitioner or to compensate the child.
Shepperd-Mobley's narrow interpretation of the Broadnax/Fahey rule was thus misplaced. It is true that the Broadnax Court was concerned with holding a wrongdoer accountable and avoiding a situation in which they would escape liability for a miscarriage or stillbirth because the mother did not suffer any independent physical injury (2 NY3d at 154). However, the Court also stated in plain terms that the medical provider defendant owed the plaintiff mother a duty of care because she was the patient (id. at 155). In practice, no medical provider can seriously argue the contrary, lest they violate their professional oath (see National Library of Medicine, Translation of the Hippocratic Oath, [*12]https://www.nlm.nih.gov/hmd/topics/greek-medicine/index.html ["I will do no harm or injustice to (my patients)]; World Medical Association, Declaration of Geneva, https://www.wma.net/policies-post/wma-declaration-of-geneva/ ["The health and well-being of my patient will be my first consideration; I will respect the autonomy and dignity of my patient"]). The fact that the medical provider also owes a duty of care to the fetus, and that a prenatal tort may breach that duty as well, does not diminish the provider's legal obligations to the mother and their liability to her if they cause an independent injury, whether emotional or physical. Sheppard-Mobley's holding was based on the central premise that, so long as an infant may recover damages for their injuries, a mother need not recover her own, independent emotional damages. However, a pregnant mother is not merely a vessel for the fetus. She is a human being in her own right, entitled to full legal recognition as such. And under established tort principles, we cannot deny compensation for an injury to one plaintiff because they may recover on behalf of another or because a different plaintiff may recover in their own right against the same defendant.
Moreover, emotional damages in this context are not punitive, but rather commensurate with the harm done by the defendant tortfeasor. Nor would recognition of a mother's cause of action for her emotional harm, independent of physical injury, result in a " 'windfall' " to her or another parent (Endresz, 24 NY2d at 485, quoting Gordon, 63 Mich L Rev at 594-595). The suggestion of some unearned benefit is, frankly, offensive. Compensation for this emotional trauma is not like winning the lottery.
Apart from the lack of a doctrinal foundation for Sheppard-Mobley's reading of Broadnax, the Court has already rejected the uncorroborated policy concerns that underlie the limitations on recovery for emotional damages. More than 60 years ago, in Woods and Battalla, the Court made clear that the difficulty of proving some claims, and the risk of opening the floodgates to litigation, provide no basis to "destroy a legal right" (Woods, 303 NY at 356; see also Battalla, 10 NY2d at 242 ["However, the question of proof in individual situations should not be the arbitrary basis upon which to bar all actions"]). Even if the Court had not done so, the public policy concerns weigh in favor of recognizing a mother's claim for emotional damages even when her child is born alive.
As our common law has evolved, so too has the legislature's interest in patient well-being and maternal health. State law now recognizes a patient's right to adequate care, informed decisions, and also mandates the establishment of standards of material care (see Public Health Law § 2803-j [requiring hospitals to provide information about maternal mental health and maternal depression]; Public Health Law § 2500 [3] [i]; [v] [ordering the Commissioner of the Department of Health to set standards of maternal care and requiring the Commissioner to make recommendations as to the best practices for every patient to receive "adequate support during their pregnancy, labor and childbirth, including access to doula and mental health services"]). The general direction of statutory law in New York has been towards increasing recognition of the risks and challenges attendant to pregnancy and childbirth.
The birth and rearing of a child injured in utero is, by its very nature, traumatizing. To argue otherwise is to ignore human experience and common sense. Denying the emotional impact on a parent is also contrary to our collective human knowledge. Since Sheppard-Mobley, the scientific literature has recognized an emerging consensus that acknowledges the trauma associated with a miscarriage or stillbirth, and also with childbirth more generally, further reinforcing Sheppard-Mobley's unworkability (see e.g. Antje Horsch et al., Childbirth-related posttraumatic stress disorder: definition, risk factors, pathophysiology, diagnosis, prevention, and treatment, 230 Am J of Obstetrics & Gynecology S1116, S1116 [2025]). As researchers have explained, "[t]here is mounting evidence to indicate that parents who develop childbirth-related posttraumatic stress disorder do so as a direct consequence of a traumatic birth experience (id.). Research recently found that childbirth-related PTSD "is highly comorbid with depression and a fear of subsequent births" (id. at S1118 [citing two studies from 2020]). One study recently measured the economic costs of perinatal mental health problems in the United States in a one-year birth cohort as $14 billion, with mothers incurring 65 percent of those costs (see Dara Dee Luca, et al., Financial Toll of Untreated Perinatal Mood and Anxiety Disorders Among 2017 Births in the United States, 110 Am J Public Health 888, 888 [2020]).
Additionally, a separate emerging consensus has "linked PTSD to a variety of physical health outcomes, including the leading causes of death and disability: heart disease, stroke, diabetes, and dementia" (Kristina Reed, et al., PTSD and physiology: The long-term effects of PTSD and relation to epigenetics, physical health, and chronic diseases, Epigenetics of Stress and Stress Disorders 138 [2022] [citing studies published between 2015 and 2017]). These physical health outcomes result not only from the negative health behaviors associated with PTSD, but also the "physiological consequences of PTSD," including "dysregulation of the . . . autonomic nervous system" (id.). This research belies the premise that there is a clean distinction between "physical" and "emotional" damages—a premise central to the Court's holding in Mitchell and implied here in the majority's holding.
Thus, there is no basis to assume that mothers who give birth to a child injured in utero by a defendant medical provider's tortious conduct feign emotional harm.[FN6] As the Court has noted, there are cases where the emotional injury is obvious (Battalla, 10 NY2d at 242). A prenatal tort leading to the birth of an injured child is just such a case. Medical documentation and testimonial evidence abound to assist in weeding out fabricated claims, and as for damages, experts are sufficiently knowledgeable to assist the trier of fact in quantifying the harms suffered based on a mother's post-delivery diagnoses.
The Court's project to bridge tort theories on emotional damages and prenatal torts has failed to account for the full scope of emotional damages experienced by pregnant mothers in their own right. Thus, while Broadnax sought to close a logical gap created by Tebbutt, Sheppard-Mobley created another. As one commentator has aptly observed, in the aftermath of Sheppard-Mobley, "the legal system provides no recourse for the emotional suffering of women who experience PTSD or other psychological trauma due to obstetric violence without physical injury" (Elizabeth Kukura, Obstetric Violence, 106 Geo L J 721, 786 [2018]). As the Appellate Division explained below, Sheppard-Mobley subjects a plaintiff mother to two "arbitrary limits," conditioning recovery on whether an infant survives childbirth and whether the mother suffers any injury beyond that normally incident to childbirth (229 AD3d 152, 164 [1st Dept 2024]). These are "blunt distinctions [that] work to exclude legitimate claims" (id.). That line is nonsensical and fails on its own terms as I have already discussed. Moreover, Sheppard-Mobley ignores the direct duty of care that a medical provider owes to the pregnant mother (id.). That duty arises out of a patient-medical provider relationship "for which breach of the existing duty or violation of a patient's bodily integrity naturally encompasses the potential for emotional harm" (id. at 165).
In addition to being contrary to basic tort principles and the scientific consensus developed since Sheppard-Mobley, its holding is inconsistent with the Court's evolving "zone of danger" jurisprudence. That line of cases further reflects the evolution of our tort principles in the direction of expanding the class of plaintiffs entitled to seek recovery for emotional distress (see Greene, 36 NY3d at 521-523 [summarizing the development of the Court's zone of danger jurisprudence]; id. at 533-536 [Rivera, J., concurring] [same]). In Tobin v Grossman, the Court recognized that after Battalla, a plaintiff may recover "for injuries sustained although precipitated by a negligently induced mental trauma without physical impact" (24 NY2d 609, 613 [1969]). However, it held that the plaintiff mother could not recover for the shock and fear caused by her two-year-old child being struck by a negligent driver, because the mother was inside a neighbor's home at the time of the accident and did not directly observe it and therefore was outside the zone of danger (id. at 612-613). The Court was unwilling to extend the defendant's liability to the mother's emotional damages, limiting it to those "directly or intentionally harmed" (id. at 619).
The Court eventually expanded the zone of danger rule in Bovsun v Sanperi (61 NY2d 219, 223-224 [1984]). In that case, the Court held that a plaintiff "negligently expose[d] . . . to an unreasonable risk of bodily injury or death . . . may recover . . . damages for injuries suffered in consequence of the observation of the serious injury or death of a member of [their] immediate family," and where "the defendant's conduct [*13]was a substantial factor in bring about [the] injury or death" (id. at 230-231). The Court thus adopted what had become the majority rule across all jurisdictions (id. at 228-229).
Then, in Trombetta v Conkling, the Court refused to extend the zone of danger rule to an aunt-niece relationship (82 NY2d 549, 550 [1993]). The Court later explained that its holding in Trombetta "was borne not of an investigation into the nature of the bond between the decedent and the plaintiff, but of [the Court's] historical precision and prudence in this area," and accordingly, the Court "adhered to [its] articulated policy of limiting the availability of recovery for the negligent infliction of emotional distress to a strictly and objectively defined class of bystanders" (Greene, 36 NY3d at 525-526 [internal quotation marks omitted]). In Greene, the Court revisited, but ultimately expanded, the class of plaintiffs entitled to recover under the zone of danger rule. Noting that neither Bovsun nor Trombetta set the boundaries for who was included within "the immediate family," the Court held that a grandchild was the immediate family of a grandparent (id. at 525; see also id. at 548-549 [Garcia, J., concurring] [asserting that the majority had overruled, "at least in part," Trombetta]).
In Greene, the Court relied, in part, on "shifting societal norms" and "common sense" to conclude that a plaintiff's grandchild is an immediate family member for purposes of the zone of danger rule (36 NY2d at 516). Sheppard-Mobley, which prevents a mother from recovering emotional damages caused by a medical provider's negligent injurious acts, performed on her body and which caused grievous harm to her unborn child, is squarely at odds with the Court's evolving tort jurisprudence on zone-of-danger claims. It makes no logical or practical sense to conclude that the grandparent in Greene may recover for her emotional damages while the mother in Sheppard-Mobley could not—simply because the child survived birth.
With respect to duty, the driver in Bovsun and the construction crew in Greene had no relationship with the bystanders in those cases, whom the Court allowed to recover for their purely emotional distress from seeing a loved one negligently injured. The duty that the driver and construction crew owed was the general duty owed to the public. By contrast, plaintiff was a patient of Dr. Grimaldi and St. Barnabus, both of whom she chose, and both of whom agreed to care for her. Yet the majority, based on the holding of Sheppard-Mobley, imputes no duty here.
As a last point, there is the peculiar—and unjust—result identified by the hypotheticals with which this dissent opens. We cannot justify treating a mother who sues for emotional damages caused by a miscarriage or stillbirth differently from a mother who sues for emotional harm caused by the birth of a child who lives, painfully, if not fully consciously, for mere moments. This line drawing is nonsensical, and it is contrary to common sense and human experience. As the Broadnax Court declared, "the need to draw difficult distinctions . . . does not justify [the Court's] clinging to a line that has proved indefensible" (2 NY3d at 156).
In sum, Sheppard-Mobley's interpretation of Broadnax cannot stand the test of time or logic. It denies compensation to mothers who suffered real harm and absolves medical practitioners of full liability for their prenatal torts. Stare decisis does not stand in the way of re-grounding our jurisprudence in fundamental tort principles and directing the common law towards just results.[FN7]
V.
The Court has developed and expanded the common law of torts to provide remedies for injuries caused by a putative defendant's breach of their duty of care. Recovery for emotional harm was once unheard of (see Mitchell, 151 NY at 109), but over time, the Court has recognized that emotional damages are both [*14]provable as a legal concept and quantifiable as a practical matter. The justifications for Sheppard-Mobley's bar on a discrete subset of claims for a mother's emotional damages, caused by prenatal injury to the surviving child, lack support. There are few things as horrific and unforgettable as losing a child, including at the moment of birth or in the minutes or days after, and especially for the birthing mother. Nothing is comparable to the codependent human relationship and the capacity to procreate that a parent experiences during pregnancy and childbirth. The scope of the harm and its impact on the mother are provable and quantifiable. Moreover, overturning Sheppard-Mobley would not open the floodgates to litigation. Sheppard-Mobley's bar to recovery only implicates plaintiffs who experience emotional damages, without any physical injury beyond the usual effects of childbirth, caused by a defendant medical provider's alleged tortious act, and which results in injury to a fetus that is born alive. One would hope that such cases would be few, but when a medical caregiver's malpractice causes harm to a patient to whom they owe a duty of care, the law must allow the patient to seek recovery.
I end where I began: "shall we follow [Sheppard-Mobley] or shall we bring the common law of this State, on this question, into accord with justice?" I agree with the Court's answer 75 years ago in Woods: "as New York State's court of last resort, we should make the law conform to right."
WILSON, Chief Judge (dissenting):
I agree with my dissenting colleagues that the good intentions underlying Broadnax and Sheppard-Mobley have paved a path to hell for those in Ms. SanMiguel's situation. I write separately to explain that even without overturning Sheppard-Mobley—and therefore without the need to overcome the force of stare decisis, there is a path to provide relief to Ms. SanMiguel and many birthing parents like her.
If Veronica SanMiguel's son had died in the womb instead of in the hospital eight days later, she could have sought recovery for the emotional distress she endured during her traumatic childbirth. But because he was born alive, albeit unable to survive, Ms. SanMiguel can recover nothing for her suffering, even if the sole reason for her grief was gross medical malpractice [FN1]. That inequitable outcome rests on this Court's attempt to remedy a related injustice created by our prior caselaw, which instead has led to the incomprehensible rule that a mother whose newborn dies as a result of medical malpractice has suffered no legally redressable emotional damage.
The rationale motivating both Broadnax v Gonzalez (2 NY3d 149 [2004]) and Sheppard-Mobley (4 NY3d 627 [2005]) was simple: in the context of medical malpractice that injures a child in utero or during childbirth, a cause of action should lie where "otherwise none would be available" (Sheppard-Mobley, 4 NY3d at 637). Under our existing caselaw, Ms. SanMiguel could have recovered for her emotional distress if her son had been stillborn as a result of medical malpractice. Because her son was born alive, she cannot. Still, as the majority reminds us, our caselaw allows the estate of her son to recover for his pain and suffering—to the extent it is provable. That, of course, is logically unrelated to a mother's own pain and suffering, but it provides a practical, though intellectually incoherent and unsatisfying, partial palliative in cases where a child's pain and suffering from malpractice might provide a meaningful recovery for the damage caused.
And there lies the problem: the medical records for Ms. SanMiguel's son (and others similarly situated) suggest he may never have been conscious and lived only eight days, all the while on life support, passing away as soon as life support was terminated. In such circumstances, the likelihood that her son's estate would receive any meaningful compensation for the malpractice, if proven, is quite remote. Sadly, then, today's decision places her squarely in the kind of "juridical limbo" members of our Court decried forty years ago (Tebbutt v Virostek, 65 NY2d 931, 933 [1985] [Jasen, J., dissenting] ["(T)he majority relegates the unborn child to a juridical limbo, where negligent acts, with fatal effect, performed upon the child are neither compensated nor deterred"]), and which we attempted to redress for the different factual circumstances present in Broadnax.
I.
This case is the latest in which our Court has considered when a parent or child can recover for emotional harm suffered during pregnancy or childbirth. As Judge Rivera explains in dissent, our common law tort jurisprudence has been dynamic and, with time, increasingly attentive to claims for emotional damages.
Although early judicial decisions purported to deny relief to plaintiffs who "overreact to incidents, lie about their injuries, or delude themselves into believing that the defendant's negligence was the source of their harm," that rationale rested on the gender of those plaintiffs (Martha Chamallas & Linda K. Kerber, Women, Mothers, and the Law of Fright: A History, 88 Mich L Rev 814, 827-28 [1990]). In the first English case, Victorian Rys. Commrs. v Coultas, 13 App. Cas. 222 [1888], Ms. Coultas became the first in a line of unfortunate "'Victorian heroines' whose cases were considered by male judges who found it distinctly difficult to understand how any woman could possibly be frightened or shocked into a miscarriage" [*15](Handford, Victorian Railways Commissioners V Coultas, 61 Am J Legal Hist at 417) [internal citation omitted]). Those decisions entrenched in our common law ideas that society has since roundly rejected: that only supersensitive people could suffer physical harms from fright; that "imaginary claims" from women would overwhelm the judicial system; and that "the infirm, the unfit, and the sensitive must take their chances when they venture outside their homes" (Chamallas & Kerber, 88 Mich L Rev at 833). We described our rationale as a merely "logical" outgrowth of the common law (Mitchell, 151 NY at 110), but we know now that logic had little to do with it (Comstock v Wilson, 257 NY 231, 234 [1931] [noting that the holding of Mitchell "cannot be tested by pure logic"]) (see Chamallas & Kerber, 88 Mich L Rev at 828 [same]).
Thankfully, the "[t]he life of the law has not been logic: it has been experience" (Oliver Wendell Holmes, The Common Law 1 [1881]). Our early decisions preventing recovery for emotional damages sound outdated in part because our Court, led by the light of experience, rendered them so. Indeed, it was in the early 1950s and 1960s,[FN2] well ahead of significant legal victories for women's rights such as the Equal Pay Act of 1963 and the Civil Rights Act of 1964, that we corrected our earlier mistakes. In 1951, in Woods v Lancet (303 NY 349 [1951]), we overturned Drobner v Peters (232 NY 220 [1921]), which had barred recovery for prenatal injuries, recognizing that to deny relief was "to do reverence to an outmoded, timeworn fiction not founded on fact and within common knowledge untrue and unjustified" (id. at 357). We rolled back Mitchell just ten years later in Battalla v State of New York (10 NY2d 237, 239 [1961]), recognizing its rule was "be unjust, as well as opposed to experience and logic," and "lack[ing] that coherence which precedent should possess" (id.).
Our adaptation of the common law to expand the ability of plaintiffs to recover for purely emotional injuries has marched far ahead of its original, incoherent skepticism of women's claims for emotional harms, though at varying speeds. Broadnax fell within a line of cases, from Woods to Batalla (plus a score of dissents from the Tebbutt line), that boldly vindicated the ability of plaintiffs to recover for emotional damages independent of any physical injury to themselves. Sometimes, as with Woods and Battalla, our common law changes fast, explicitly overruling its rigid precedents in recognition of new classes of claims. Sometimes, the common law moves slowly: our most recent decision in Greene v Esplanade Venture Partnership (36 NY3d 513 [2021]) followed the "historically circumspect approach" by making the narrow recognition that a plaintiff's grandchild is considered "immediate family" for purposes of a zone of danger claim (id. at 516). But regardless of how wide (or narrow) their scope, those cases all involved loved ones (often mothers) who observed some of the most shocking harms occur to their most beloved family members (often their children). From our early suspicion of such claims as imaginary, our common law tort jurisprudence has undergone remarkable though necessary changes, proving capacious enough to uphold the truth that "[w]hat once was accepted as a basic social premise must be carefully examined in a way that reflects the realities of both our changing legal landscape and our lives" (id. at 524-525).
[*16]II.
The common law may change in a leap (as in Battalla and Woods) or incrementally (as in Greene). Broadnax was a leap forward that Sheppard-Mobley converted into a small step. But the choice in this case is not limited to leaping or standing still. Instead, a faithful application of the rationale of Broadnax and Sheppard-Mobley would allow for a path to recovery for Ms. SanMiguel without overruling our prior caselaw (and, therefore, without any need to meet the test for overcoming the force of stare decisis). The rationale motivating those cases was to provide compensation for medical malpractice during pregnancy or delivery where, otherwise, "none would be available" (Sheppard-Mobley, 4 NY3d at 637). But Ms. SanMiguel likely has no such cause of action to recover, because her son was likely never conscious enough to bring any successful action for wrongful death, much less one that would result in a material award of damages given the shortness of his life. That is an intolerable position in which to place Ms. SanMiguel, and it is all the more intolerable because it would be avoidable with a straightforward rule that treats a child born with minimal consciousness and incapable of surviving independently of life support as falling within the protection provided by Broadnax.
To its credit, Sheppard-Mobley aspired to define, for good, the contours of liability flowing from a mother's emotional suffering due to injuries to her child in utero. If we presume that a child, once born, could always obtain meaningful recovery for injuries inflicted in utero, then the rule of Sheppard-Mobley seems sensible as a practical matter, though logically unsound:[FN3] if the child is stillborn, the mother can recover for emotional damages she suffers; when a child is born, the child (or child's estate) can recover. In the technical language of tort law, once an infant is born, the doctor owes the infant a duty of care, not the infant's pregnant parent (Howard v Lecher, 42 NY2d 109 [1977]; Sheppard-Mobley); if the infant is stillborn, the pregnant parent, not the infant, is owed a duty of care (Endresz v Friedberg, 24 NY2d 478 [1969]; Broadnax). If we assume the premise of Sheppard-Mobley is correct, the holes created by Tebbutt and our general aversion to awarding recovery for emotional damages were closed by Broadnax, and we can leave well enough alone.
However, the instant case shows that Sheppard-Mobley and Broadnax closed one but not all gaps in our caselaw. Ms. SanMiguel was in labor for over 42 hours and endured four straight hours of labor in the moments leading up to delivery, which included multiple failed efforts to deliver her infant child via vacuum extraction. After an emergency C-section, her infant was delivered with no heartbeat and was resuscitated immediately; he infant was intubated with a 3.5 mm tube placed in his trachea through his mouth. Doctors performed chest compressions, but still no heart rate was detected. At five minutes, the infant's heartrate was greater than 100 beats per minute, but the infant had no "respiratory effort" and was "unresponsive." The infant's Apgar scores were zero at one minute, three at five minutes, and four at ten minutes. At ten minutes of life, the infant was transported to the neonatal intensive care unit and placed on a mechanical ventilator with 100% oxygen. The infant was "lethargic and unresponsive to stimuli." Later that afternoon, the infant [*17]was transferred to Montefiore Medical Center for brain cooling and other treatment. The child could not survive without life support and passed eight days later, after life support was discontinued.
As admitted at oral argument, any recovery available to Ms. SanMiguel's child would be based on a theory of conscious pain and suffering; but not all children are born conscious, especially those born in as dire a condition as this one. And without consciousness, there can lie no recovery for pain and suffering (McDougald v Garber, 73 NY2d 246 [1989]; Cummins v County of Onondaga, 84 NY2d 322, 325 [1994] ["Without legally sufficient proof of consciousness following an accident, a claim for conscious pain and suffering must be dismissed"]). The amount of pain and suffering, if any, would also be limited by the duration of the infant's life. Therefore, because her child was born, Ms. SanMiguel cannot recover for her emotional damages—but if her child was never conscious, then she also cannot recover on his behalf, and even if he was born conscious, his pain and suffering would be limited by the short duration of his life.
That is an unacceptable result, and one that is avoidable without overruling or undermining the purposes of Sheppard-Mobley and Broadnax. In Broadnax, Sheppard-Mobley and even the instant case, the Court justified its holdings on the fact that there will be "no gap in liability and thus no need to avoid [the] perverse incentives" of immunizing doctors from liability (majority op at 14). But that perverse incentive is precisely what the majority's decision commands: parents whose children die soon after birth with no or little evidence of consciousness will be left with no recovery for the simple reason that their children briefly kept nominally alive through advances in medical technology not available when we decided Drobner, Mitchell, Tebbut, Vaccaro or even Sheppard-Mobley. Such advances, which have been drastic in the mere 20 years since our decision in Sheppard-Mobley, are only accelerating (Pankaj Soni & Manjunath Mallikarjuna Nagalli, "Enhancing neonatal resuscitation outcomes: bridging theory and practice," European J. Pediatrics [March 2025] ["Neonatal resuscitation practices have undergone tremendous changes over the past two decades, with progress accelerating due to advances in medical technology, scientific research, and improvements in clinical practices"]). If clinical practices and medical technologies continue to improve at the rapid rate they have for the last two decades , the gap left by Sheppard-Mobley is likely to widen into a chasm.
One way to close the gap, consistent with the rationale underlying Broadnax and Sheppard-Mobley, is to treat the case of a child born with minimal consciousness and incapable of surviving independently of life support as legally comparable to the stillbirth in Broadnax. Nothing in Broadnax or Sheppard-Mobley forecloses the extension of Broadnax's protection to Ms. SanMiguel and other mothers like her. If we are not yet ready to abandon Sheppard-Mobley as my dissenting colleagues and the Appellate Division recommend we do, a faithful adherence to the logic of those cases should compel us to provide a meaningful remedy here. To quote Sheppard-Mobley at length:
"[In Broadnax] we recognized the injustice created by 'categorically denying recovery to a narrow, but indisputably aggrieved, class of plaintiffs.' It was this particular injustice that we sought to rectify when we held that a mother could recover for emotional injuries when medical malpractice caused a stillbirth or a miscarriage, even without a showing that she suffered an independent physical injury. In other words, our holding in Broadnax/Fahey is a narrow one, intended to permit a cause of action where otherwise none would be available to redress the wrongdoing that resulted in a miscarriage or stillbirth.
In the case now before us, the Appellate Division improperly extended our decision in Broadnax/Fahey by reinstating Sheppard's sixth cause of action seeking damages for emotional harm based on the birth of a live infant with physical injuries. The rule pronounced in Broadnax/Fahey does not apply here, where infant plaintiff was injured in utero, but carried to term and born alive. [*18]After all, as we stated in Woods v. Lancet, a child born alive may bring a medical malpractice action for physical injuries inflicted in the womb" (Sheppard-Mobley, 4 NY3d at 637 [internal citations omitted]).
The holdings in both Broadnax and Sheppard-Mobley thus rely on symbiotic rationales: in Broadnax, as elaborated by Sheppard-Mobley, a mother without an independent physical injury could recover for emotional injuries from a stillbirth for the simple reason that no other cause of action was "available to redress the wrongdoing" (id.; Broadnax, 2 NY3d at 154 ["If the fetus cannot bring suit, 'it must follow in the eyes of the law that any injury here was done to the mother'"] [internal citation omitted]). Conversely, in Sheppard-Mobley, when a cause of action was available, then no recovery could lie for emotional damages without an independent physical injury. At least in the birthing context, when our duty to provide a remedy for substantial wrongs collides with our aversion to rewarding emotional damages absent physical injury, the former beats the latter; when there is no collision, the latter prevails. The former is what happened in Broadnax; the latter is Sheppard-Mobley.
The most faithful application of that rationale would lead us to hold that plaintiffs like Ms. SanMiguel can recover because their children are born with minimal, if any, consciousness and are not able to survive independent of life support. That is for the simple reason—the one motivating Broadnax and Sheppard-Mobley alike—that there is effectively no remedy available for a child who has likely never attained consciousness. That rule has the immeasurable benefit of widening the scope of birthing parents who can recover when grave harms attend their child's birth. It is also just as workable as the rule from Sheppard-Mobley. In wrongful death claims, our trial courts routinely evaluate whether a child ever attained consciousness and, perhaps most simply, whether a child could have ever survived independently of life support technology. Those very facts are before us in this case.
This rule was best articulated in an earlier case by Justice Renwick. In Mendez v Bhattacharya, 15 Misc 3d 974 [Sup Ct 2007], she presciently sensed the very gap our Court refuses to close today:
"[T]he considerations in this case are identical to those in Broadnax and the outcome should be the same. In this case . . . it is uncontroverted that the baby had no consciousness or awareness. As a result, there can be no recovery, since there can be no recovery for conscious pain and suffering without some level of awareness. Such situation clearly comports with the rationale of Broadnax and Sheppard-Mobley that the plaintiff mother's cause of action 'fills the gap,' and permits a cause of action where otherwise none would be available, to redress wrongdoing resulting from physical injury inflicted in the womb at labor and delivery" (id. at 982-983 [internal citation omitted]).
Therefore, Supreme Court reasoned rightly, "a plaintiff mother should be able to raise a cause of action for emotional distress where there is no indication that the estate of the baby possesses a cause of action for the infant's pain and suffering" (id.). Any other rule would create a strange situation whereby a doctor could foreclose a claim for emotional damages because an infant was born alive, then obtain dismissal of the wrongful death action because the infant lacked consciousness (id.).
The majority is concerned that overturning Sheppard-Mobley might precipitously expand tort liability with serious public policy ramifications (majority op at 16-17). The alternative I propose simply fills a small but important gap left over by Broadnax and Sheppard-Mobley by addressing the relatively few cases in which medical malpractice causes neither a stillbirth nor a surviving infant able to recover meaningful damages.
Some might worry that my proposal would merely transfer the site of factual dispute in these cases. Whereas now, parties may dispute whether a child was stillborn, with my proposed rule, a dispute might [*19]focus on whether the child attained consciousness or could survive without life support for a significant enough time to warrant a meaningful damage award for pain and suffering, raising questions about just how long a child would need to survive off life support, how "conscious" a child must be, et cetera. Those are difficult questions, and certainly fact-specific ones, but no more difficult or fact specific than many other such issues that our trial courts and juries handle daily.
But there is a simple version of my proposed rule that would address that concern head on: let the plaintiff pursue both the infant's estate's claim for wrongful death and the parent's claim for emotional damages, but recover for only one. Allowing both avenues of relief but limiting the plaintiff to recovery of the greater would close the gap left by our existing caselaw without displacing it. The remaining factual issues: how much to award for a mother's emotional injury or how much to award for a deceased child's pain and suffering—are the same issues that our courts decide under our existing caselaw.
We have recently said the whole point of a suit in tort is to "compensate for the damage suffered, at the expense of the wrongdoer'" (Moore Charitable Found. v PJT Partners, Inc., 40 NY3d 150, 161 [2023], quoting Prosser and Keeton, Torts § 2, at 7 [5th ed 1985]). In a case like this, there are many differences between the various paths to recovery, each vindicating different values, each offering varied levels of recovery. But the fundamental aim is the same: to avoid allowing negligent conduct to go unchecked where a duty is owed to someone. The basic strength of my proposal is that it achieves that purpose—a purpose we expressed in both Broadnax and Sheppard-Mobley; the basic flaw in majority's rule is that it does not. Nevertheless, the majority today chooses to swerve this path, at an irretrievable cost to people like Ms. SanMiguel. In doing so, the Court upholds Broadnax and Sheppard-Mobley in name only, at the expense of their underlying rationales.
*
* *
The majority rests its decision on reaffirming what it terms our "long-established skepticism of claims for purely emotional damages" (majority op at 17). But that skepticism has been shed, sometimes in bits, sometimes in chunks, over the last century. Our duty has never been defined as crafting limits to the claims available to redress wrongdoing; we also have a duty to ensure our tort jurisprudence aligns with "reshaped societal norms and everyday common sense" (Greene, 36 NY3d at 526):
"In all likelihood the historical school has exaggerated the unconscious, the unvolitional, element in the development of law. If, however, its assumptions be accepted, they exact, not blind reproduction of the past, but searching scrutiny of the present, for law, by the very terms of the hypothesis, is the expression of the convictions of the present, not the convictions of the past" (Benjamin N. Cardozo, The Nature of the Judicial Process [1921]).
Because today's ruling rejects both the swift and the gradual approach to bringing our common law into accordance with the convictions of the present, I respectfully dissent.
Order insofar as appealed from reversed, with costs, plaintiffs' fourth cause of action for lack of informed consent against defendant Meryl Y. Grimaldi dismissed and certified question answered in the negative. Opinion by Judge Singas. Judges Garcia, Cannataro and Halligan concur. Judge Rivera dissents and votes to affirm in an opinion, in which Judge Troutman concurs. Chief Judge Wilson dissents in a separate dissenting opinion.
Decided October 21, 2025 

Footnotes

Footnote 1: The Appellate Division modified Supreme Court's order to grant St. Barnabas's separate motion for summary judgment dismissing a cause of action not at issue on this appeal (see 229 AD3d at 167).

Footnote 2: As limited by the briefs, Dr. Grimaldi and St. Barnabas appeal only from so much of the Appellate Division order as affirmed Supreme Court's denial of Dr. Grimaldi's motion for summary judgment dismissing plaintiff's fourth cause of action.

Footnote 3: A wrongful birth claim generally arises from a defendant's negligent failure to provide information that would have led the plaintiff to terminate their pregnancy (see Becker, 46 NY2d at 410).

Footnote 4: Expert testimony is also required to establish a prima facie case of lack of informed consent (see CPLR 4401-a).

Footnote 5: In addition, expansive liability for lack-of-informed-consent claims would be at odds with the purpose of the governing statutory scheme, which the legislature enacted to limit doctors' liability (see Governor's Program Bill Memorandum at 1, Bill Jacket, L 1975, ch 109). Indeed, when the legislature enacted the scheme, the common law clearly established that purely emotional damages were not generally recoverable in tort actions. The legislature gave no indication that it intended to displace that longstanding rule for lack of informed consent claims (cf. People v Galindo, 38 NY3d 199, 105 [2022] ["We assume the legislature was aware of the state of the law and acted with that understanding in drafting (legislation)"]).

Footnote 1: In Greene v Esplanade Venture Partnership, the Court expanded this theory of liability to include a grandchild within a grandparent's "immediate family" (36 NY3d 513, 516 [2021]).

Footnote 2: Of the six participating Judges in Tebbutt, only three concurred in the majority's full memoranda, as Judge Meyer concurred only on constraint of a prior case, Vaccaro v Squibb (52 NY2d 809 [1980]) (52 NY2d at 941).

Footnote 3: The Court remitted the matter to Supreme Court to allow plaintiff to amend her complaint to plead her allegations that she suffered physical injury "independent of the birth of an impaired child" (4 NY3d at 637-638).

Footnote 4: I agree with the majority that a cause of action based on lack of informed consent is a form of medical malpractice, and it is therefore not a ground to avoid applying Sheppard-Mobley to plaintiff's claims for emotional damages arising from an alleged failure to obtain her consent to the vacuum extractions her doctor conducted during delivery (see majority op at 10-12).

Footnote 5: The Apgar score is a standardized measurement of the clinical status of a newborn and measures their color, heart rate, reflexes, muscle tone, and respiration, on a scale of zero, one, and two (Kristi L. Watterberg, et al., The Apgar Score, 136 Am Academy of Pediatrics 819, 819 [2015]). A combined score of seven to 10 is considered "reassuring," a score of four to six is "moderately abnormal," and a score of zero to three is "low" (id. at 820). A five-minute score of zero to three "correlates with neonatal mortality in large populations" (id. at 821).

Footnote 6: Assuming the potential for some amount of fabrication or exaggeration by tort plaintiffs, there is no evidence to suggest that pregnant mothers would fabricate injury at a higher rate than any other personal injury plaintiff.

Footnote 7: The majority's focus on the relative recency of Sheppard-Mobley, decided 20 years ago, as a reason not to overturn it is inconsistent with the Court's approach to stare decisis (see majority op at 15). The Broadnax Court overturned Tebbutt 19 years after deciding it (2 NY3d at 153). The Court needed no additional time to conclude that Tebbutt was "arbitrary and unfair," and fit uncomfortably in its tort jurisprudence (id. at 153-154). The same is true now, and Sheppard-Mobley will not age any better with the passage of more time.

Footnote 1: For reasons not evident in the record, Ms. SanMiguel voluntarily dismissed her medical malpractice claims, leaving only her claim for lack of informed consent before us on this appeal. Because I agree with the majority that her informed consent claim is a form of a malpractice claim, and because the explanation I advance here would therefore affect both claims equally, I refer throughout to "medical malpractice" as subsuming both.

Footnote 2: As early as 1941, Prosser observed in early decisions on emotional damages "a distinctly masculine astonishment that any woman should ever be so silly as to allow herself to be frightened or shocked into a miscarriage" (Prosser, Handbook on the Law of Torts 55 [1st ed. 1941]).

Footnote 3: The distinction I make here is the following: a child who lives but suffers from medical malpractice that occurred during pregnancy or delivery has injury independent from the mother's emotional injury. In the case of Bovsun or Greene, for example, we necessarily recognized that the emotional injury of the bystander relative was distinct from the injury (physical or emotional) of the person struck by the car or load of bricks, and both could recover for their independent injuries. As a logically or intellectually sound matter, the same is true for a child and mother, which is the fundamental point of Judge Rivera's dissenting opinion. As a practical matter, however, an award of damages for malpractice is, in part, designed to deter future malpractice. Where no meaningful award of damages is available for malpractice, that deterrent effect is lost. The thrust of Broadnax and Sheppard-Mobley is to provide some meaningful damages where there is malpractice, though disregarding the question of what persons were injured and how.